563 A.2d 94

PENNSYLVANIA MANUFACTURERS' ASSOCIATION
INSURANCE COMPANY, Appellee,

v.

Ronald B. WOLFE and Rose Wolfe, His Wife, Richard C.
Angino and Angino & Rovner, P.C., Appellants.

PENNSYLVANIA MANUFACTURERS' ASSOCIATION
INSURANCE COMPANY, Appellant,

v.

Ronald B. WOLFE and Rose Wolfe, His Wife, Richard C.
Angino and Angino & Rovner, P.C., Appellees.

Superior Court of Pennsylvania.

Argued Sept. 7, 1988.

Filed July 11, 1989.

Reargument Denied Aug. 31, 1989.

Petition for Allowance of Appeal Granted Jan. 29, 1990.

Richard C. Angino, Harrisburg, for appellants (at 96) and appellees (at 139).

Dennis J. Bonetti, Harrisburg, for appellant (at 139) and appellee (at 96).

Before BECK, KELLY and HESTER, JJ.

BECK, Judge:

This case presents a question not previously addressed in our appellate case law. The issue is: Where an attorney for an injured employee who has been paid worker's compensation benefits negotiates a structured settlement on behalf of the injured employee in the employee's action against a third party tortfeasor, and the initial payment under the settlement is not sufficient to pay both the attorney's fee and the subrogation claim of the employer's compensation carrier under Section 319 of the Workmen's Compensation Act, Pa.Stat.Ann. tit. 77, § 671 (Purdon 1989), is the attorney or the carrier entitled to first payment?

Section 319 states in pertinent part:

Where the compensable injury is caused in whole or in part by the act or omission of a third party, the employer shall be subrogated to the right of the employe, his personal representative, his estate or his dependents,

against such third party to the extent of the compensation payable under this article by the employer; reasonable attorney's fees and other proper disbursements incurred in obtaining a recovery or in effecting a compromise settlement shall be prorated between the employer and employe, his personal representative, his estate or his dependents. The employer shall pay that proportion of the attorney's fees and other proper disbursements that the amount of the compensation paid or payable at the time of recovery or settlement bears to the total recovery or settlement. Any recovery against such third person in excess of the compensation theretofore paid by the employer shall be paid forthwith to the employe, his personal representative, his estate or his dependents, and shall be treated as an advance payment by the employer on account of any future instalments of compensation.

Pa.Stat.Ann. tit. 77, § 671 (Purdon Supp.1988).

The issue arises from the following facts and procedural history. On December 19, 1981, appellant Ronald Wolfe suffered injuries from a fall on the parking lot of Weis Markets. At the time of the injury, Wolfe was engaged in making a delivery for his employer, Allegheny Beverage Corporation. Allegheny's worker's compensation carrier, appellee/cross-appellant Pennsylvania Manufacturers' Association Insurance Company ("PMA"), soon began paying Wolfe compensation benefits.

On December 18, 1983, Wolfe instituted a personal injury action against Weis Markets, the alleged third party tortfeasor. Wolfe was represented in this action by co-appellant, the law firm of Angino & Rovner, P.C. ("Angino"). Angino and Wolfe executed a contingent fee agreement whereby Wolfe agreed to pay Angino a fee equal to forty percent (40%) of the amount recovered.

There is a factual dispute between the parties as to whether Angino also agreed to represent PMA's subrogation interest in the Wolfe personal injury suit. The parties exchanged various letters and otherwise communicated with each other both prior to institution of the personal injury

suit and thereafter. PMA argues these communications form a contract between PMA and Angino pursuant to which Angino agreed to represent PMA's interest. Angino denies that such a contract was formed.

In April 1985, serious settlement negotiations between Weis Markets and Wolfe began. The result was an agreement that the case would be resolved via a structured settlement whereby the total value of the settlement would not be paid upfront, but rather spread out over a number of years. The structure envisioned an initial payment of $110,-000 to Wolfe, which Wolfe orally agreed to pay Angino as full payment for Angino's contingent fee, plus monthly payments to Wolfe of $1,250 for life. Wolfe was also to receive sizeable lump sum payments every five years for the next twenty-five years.

PMA objected to this proposal on the ground that it did not provide a sufficient upfront payment to reimburse PMA for compensation it had already paid Wolfe as provided by Section 319 of the Workmen's Compensation Act. PMA also immediately retained separate counsel to protect its interests in this matter.

Weis Markets refused to consummate the settlement without PMA's approval, obviously fearing that it would be subject to an action by PMA if the settlement was unsatisfactory to it. In order to preserve the settlement, PMA and Angino agreed to hold their dispute over the priority of their respective claims in abeyance. PMA withdrew its objection to the settlement and a settlement agreement was executed between Weis Markets and Wolfe. This agreement began with the following recital:

Plaintiffs and Defendants entered into an agreement whereby Defendants agreed to pay to Plaintiffs $110,000 in a lump sum and periodic payments of $1,250 per month for life (20 year guarantee) with additional periodic balloon payments at five (5) year intervals commencing in 1990 and continuing to 2010. Said settlement has a present value of approximately $274,000. Following said agreement Pennsylvania Manufacturers' Association

(PMA) asserted a Worker's Compensation lien interest in the settlement. Plaintiffs contend that the $110,000 lump sum payment is to cover Plaintiffs' 40% attorney's fees contract and expenses. PMA contends that it has a legal right to half of the lump sum because of its Worker's Compensation lien. Being unable to resolve the issue existing between PMA and Plaintiffs, PMA, Plaintiffs and Defendant have agreed to escrow $55,000 of the $110,000 lump sum payment. Defendants are to be released from future litigation between PMA and Plaintiffs and from any future obligations in this regard.

The Settlement Agreement further recited that PMA would execute a release of the defendants in the Wolfe action and that defendants would then issue a check in the amount of $55,000 (one-half of the initial payment) jointly payable to PMA and appellants. The check was to be deposited in an escrow account. Although PMA was not a signatory to this Agreement, the check was issued as the Agreement contemplated and it recited that it was tendered by defendants in final settlement of all claims.

PMA and Angino then executed an Escrow Agreement governing the escrow of the $55,000. The Escrow Agreement begins with numerous recitals providing the background giving rise to the escrow arrangement. These recitals set forth the identities of the various parties and the facts relating to Wolfe's injury and personal injury suit against Weis Markets. The recitals continue as follows:

WHEREAS, a dispute has arisen between Angino and PMA as to PMA's entitlement to recover its subrogation interest from the initial lump sum payment of $110,000. It is PMA's position that it is entitled to recover the its [sic] subrogation interest from the initial lump sum payment to the extent of 60 percent of PMA's total workmen's compensation lien existing at the time of this Agreement and which would recognize a 40 percent attorney's fee payable to Angino for professional services rendered in connection with developing the settlement fund.

WHEREAS, it is Angino's position that he is entitled to recover an attorney's fee of 40 percent of $275,000, plus expenses, or $115,000 from any initial lump sum payment. Accordingly, it is Angino's position that no money is available to PMA from the initial lump sum payment for PMA's workmen's compensation subrogation lien.

WHEREAS, Angino and PMA desire to create a single, interest bearing account into which the sum of $55,000 would be deposited as a security to protect PMA's subrogation lien pending a judicial determination of the priority of various claims to the proceeds by the parties to the instant agreement.

The actual covenants of the Escrow Agreement provide only for the establishment of the escrow account, the appointment of the escrow agent, and the disposition of the account upon resolution of the dispute between PMA and Angino.

On September 20, 1985, PMA instituted suit against Wolfe and Angino in the court of common pleas. The complaint contains three counts. The first count pleads PMA's statutory subrogation lien and requests payment of the entire amount. Thus, Count I demands payment of more than the $55,000 of escrowed monies. This count pleads that Wolfe and Angino's conduct in refusing to honor PMA's subrogation interest entitles PMA not only to the amount that the Escrow Agreement recites as being PMA's claim, i.e., the total compensation benefits paid minus PMA's proportionate share of the attorney's fees incurred by Wolfe in settling the personal injury lawsuit, but rather to the full amount of benefits paid without deduction for any share of the fees, plus interest. The complaint alleges that this amount is $87,468.81, not including interest.[1]

1. On appeal, PMA concedes that it does bear responsibility for a proportionate share of Wolfe's attorney's fees in prosecuting the third party action. However, PMA contends that the total compensation paid is $93,700 and that PMA's share of fees is only $18,400, thus leaving PMA with a total subrogation claim of $75,280. This is over $20,000 more than the amount of the escrowed funds.

Count II of the complaint sounds in contract and alleges that Angino agreed to represent PMA in connection with the Wolfe personal injury suit, failed to do so and is, therefore, liable for damages in the amount of all benefits PMA has paid to Wolfe, plus interest.

Count III sounds in tort, and alleges that Angino was negligent in failing to protect PMA's subrogation interest. It seeks the same damages as Counts I and II.

After discovery, both parties filed Motions for Summary Judgment. The trial court granted PMA's motion as to Count I, finding that PMA's statutory subrogation interest has priority over appellants' rights, but awarded PMA only the amount of the escrowed funds. The court refused to award PMA any further sums because of Wolfe/Angino's allegedly improper conduct in refusing to honor PMA's subrogation interest. The court also granted Wolfe/Angino's motion for summary judgment as to Counts II and III, refusing to award PMA any damages for breach of contract or negligence by Angino. In this regard, the court found that by entering into the Escrow Agreement, PMA had waived its right to claim any amounts in excess of the escrowed monies. In the trial court's words:

> That agreement was made for the specific purpose of obtaining a settlement in the Wolfe's [sic] negligence action, and it embodies the outer limits of the parties' rights and liabilities with respect to the priority of their claims.

Trial Court Opinion at 4.

Both parties appealed. We agree with the trial court's disposition and affirm.

PMA Brief to this Court also contains a summary request for an award of its own attorney's fees and expenses in prosecuting this action. We may summarily dismiss this request by noting that PMA agreed to prosecute this action to resolve all outstanding issues between the parties and there is nothing in the record to indicate that in doing so PMA conditioned its agreement to litigate these issues on Wolfe or Angino paying PMA's fees and expenses. As we conclude *infra*, the instant dispute is limited to a dispute over disposition of the escrowed funds, plus interest.

■ We begin, as did the trial court, with a consideration of Counts II and III of the complaint, as to which the trial court entered summary judgment against PMA, and with the trial court's determination that even as to PMA's subrogation lien, pled in Count I, PMA was limited to claiming the escrowed funds alone, plus interest. As stated above, the trial court reasoned that PMA had waived its right to pursue any causes of action against Wolfe/Angino other than that based on its subrogation lien under Section 319. Moreover, even as to the subrogation lien, the trial court found that PMA had waived its right to pursue any funds in excess of the $55,000 in the escrow fund, plus interest.

This is unquestionably a proper resolution. PMA was confronted with a difficult situation when, on the eve of the trial of Wolfe's personal injury suit, it became clear that the structured settlement Weis was offering would not provide enough upfront monies to cover both Angino's fee and PMA's subrogation lien. PMA then hired separate counsel and considered its choices. It could either prevent the settlement by withholding its approval thereof, which Weis required, or it could agree to the settlement and resolve its dispute over its subrogation lien later. The first alternative was unsatisfactory. If the case was not settled, there was a good chance that a trial would yield a defense verdict. There would then be no fund from which PMA could collect its subrogation lien.

The second choice also had its disadvantages. If the case was settled, PMA would have to release Weis from any future claims and be left to proceed against Wolfe/Angino, with uncertain results. PMA chose the latter. In doing so, PMA made a conscious decision to forego its right to prevent the structured settlement and allow the Wolfe personal injury suit to go to trial, at which PMA could have asserted its subrogation lien. PMA chose instead to permit the settlement, avoid a risky trial, and to assert its subrogation lien only against Wolfe/Angino and only under those conditions that are set forth in the various agreements between the parties. These agreements reveal that the sole

right PMA reserved was a right to protect its subrogation lien under Section 319. They also reveal that PMA expressly recognized that under Section 319, this lien is limited to the amount of compensation benefits payable, minus PMA's proportionate share of the attorney's fees expended in obtaining the recovery against the third party tortfeasor. Both the Settlement Agreement and the Escrow Agreement are expressly premised on PMA's recognition that its rights in this matter are limited to its subrogation lien, and that the lien is calculated by subtracting PMA's share of attorney's fees from benefits payable, yielding in this case a subrogation lien valued at $55,000, i.e., the escrowed amount.

This premise, on which all parties depended in agreeing to allow the settlement to proceed and to have the dispute between PMA and Wolfe/Angino resolved separately, is contained in the recitals of both the Settlement Agreement and the Escrow Agreement, as quoted above. Both agreements recite that PMA's claim is its subrogation claim, that the value of the claim is sixty percent (60%) of the compensation already paid by PMA, and that the resolution of this claim and this claim alone would be pursued separately by PMA and Wolfe/Angino.

PMA would have us ignore these recitals and consider its agreement to escrow funds in a vacuum. This we cannot do, as our Supreme Court has specifically stated that:

> The recital of a fact upon the truth of which the execution of a contract is dependent and which, reflecting a joint attitude of mind, is made an integral and essential part of a contract, is conclusive in the absence of mistake sufficient to reform the contract.

*Kefover v. Potter Title and Trust Co.*, 320 Pa. 51, 57, 181 A. 771 (1935). An exception to this general rule, not applicable to this case, arises where the recitals of background facts in the parties' agreements are in conflict with the operative provisions of the agreements and we are faced with resolving an ambiguity. In the instant case, the agreements clearly and uniformly express the under-

standings of the parties and the background against which they were reached. We cannot ignore what the agreements unambiguously state.

Moreover, we have no doubt that Wolfe/Angino reasonably relied on PMA's expressed position that it would assert a claim only to the escrowed monies and only on the basis of its subrogation interest. They may well never have agreed to the structured settlement and escrow arrangement if they envisioned that PMA would later be permitted to reverse fields and assert a claim for the entire amount of compensation payable, thereby denying liability for any contribution toward attorney's fees, plus interest, costs and other relief, under theories ranging from professional negligence to breach of contract.

We, therefore, construe this case as did the trial court and find "the long and short of this entire litigation ... [to be] a legal question as to which party has priority to the sum of $55,000 which is now in escrow." Trial Court Opinion at 6–7.[2]

The trial court's grant of summary judgment in favor of Wolfe/Angino on Counts II and III of PMA's complaint is affirmed.

■ We now turn to the resolution of the admittedly difficult question of which of the competing parties is entitled to first payment out of the initial lump sum payment from the structured settlement. We emphasize that this is a question of priority of payment and not of entitlement. Both parties clearly deserve to be paid. PMA had a duty to pay worker's compensation benefits to Wolfe and it

2. We also note that PMA's contract and tort claims are in a sense mooted by our disposition of their subrogation claim. By granting PMA relief on this claim, we effectively remove any damages they may have suffered as a result of Wolfe/Angino's conduct, except to the extent that PMA waived its right to further damages. Moreover, we have difficulty in seeing how PMA could prove that Wolfe/Angino's conduct was the cause of any damage to PMA under any circumstances. Since PMA retained new counsel before the Wolfe personal injury action was resolved, PMA was able to protect its interest fully before any damage to PMA could be done through a resolution of that action which did not take account of PMA's interest.

fulfilled this duty. Its recompense for such payments is its right to be subrogated to any recovery by Wolfe against a third party tortfeasor.[3] *Trumble [Trumbull] v. Paris Linen and Decorating Shops*, 95 Montgo. Co. R. 125, *aff'd mem.*, 249 Pa.Super. 629, 377 A.2d 1004 (1977), *allocatur denied* 11/10/77. On the other hand, there would be no fund from which to compensate PMA if it were not for the services of Angino in representing Wolfe in the third party action and in settling it. Thus, it would appear that the equities are in equipoise and our difficult task is to construe and apply the law, knowing that whatever the result, payment to one party will be delayed.[4]

**3.** Wolfe/Angino also attack PMA's subrogation claim on the independent ground that PMA cannot assert a subrogation claim where the third party tortfeasor action is resolved through a settlement as opposed to being tried to a verdict because a settlement does not establish the negligence of the third party as the cause of the employee's injuries. The trial court rejected this contention on the ground that it has recently been rejected in several appellate cases. *See Helms Express v. Workmen's Compensation Appeal Board (Lemonds)*, 106 Pa.Commw. 287, 525 A.2d 1269 (1987), appeal dismissed 10/88; *Heiser v. Workmen's Compensation Appeal Board*, 95 Pa.Commw. 350, 505 A.2d 1060 (1986); *Trumble v. Paris Linen and Decorating Shops*, 95 Montg. Co.R. 125, aff'd mem., 249 Pa.Super. 629, 377 A.2d 1004 (1977), *allocatur denied* 11/10/77. The record reveals that this issue is also presently pending in a separate workmen's compensation administrative proceeding between these parties concerning PMA's right to future credit against compensation payable. The workmen's compensation referee presiding over that matter has already determined that PMA's subrogation claim is not invalid on the ground that the Wolfe personal injury was resolved through a settlement. The referee's decision has been appealed to the Workmen's Compensation Appeal Board. We find no error on this ground, but leave final determination of the question to the workmen's compensation authorities where it properly resides. We decide today only whether, assuming PMA has a valid subrogation claim, it preempts Wolfe/Angino's claim to the initial settlement payment. Should the workmen's compensation authorities later determine that PMA had no subrogation claim for any independent reason, obviously all of the initial payment will be due to Wolfe/Angino.

**4.** We take some comfort from the fact that to a certain extent, the parties themselves created this difficult position. It is they who determined that they would not resolve the priorities question at the time of structuring the settlement or, alternatively, refuse to settle unless sufficient upfront monies were available for both. They determined that it was advisable to secure a settlement first, thereby

Determining who shall be paid first is a question of statutory construction. That is, where there is a structured settlement and some monies are paid at the outset, but the initial payment is not enough to cover the claims of both the attorney for the employee and a subrogated employer/carrier, does Section 319 contemplate that the injured employee's attorney shall be paid first out of those monies, or does it contemplate that the employer/carrier will be paid first? In actuality, this problem was probably never contemplated by the legislators in drafting Section 319. The section was last amended in 1972, well before the advent of structured settlements as a popular means of resolving disputes. Moreover, there is no Pennsylvania case specifically addressing this issue. Thus, we must glean the proper application of Section 319 to this issue from more general principles regarding the meaning of Section 319 and the policies that underlay it. Our review of these principles and policies convinces us that the subrogation right is primary and attaches immediately upon recovery or settlement by the employee with the third party.

An employer's right to be subrogated to the recovery of a compensated employee against a third party is an equitable right. *Workmen's Compensation Appeal Board v. Del Vecchio*, 23 Pa.Commw. 244, 351 A.2d 691, 693 (1976). As such, the purpose of providing the right is to achieve substantial justice between the parties. Since the employer has already paid benefits to the employee, when the employee recovers funds from another in compensation for the same injury, the employer is subrogated so that it is reimbursed for payments made and so that a double recovery by the employee is prevented. *Dale Manufacturing Co. v. Bressi*, 491 Pa. 493, 421 A.2d 653, 654 (1980). Section 319 expresses this right unequivocally, stating that the employer "shall" be subrogated to the right of the employee against the third party tortfeasor.

avoiding the possibility of no fund for either to lay claim to, and then take their chances on priority of payment.

The Supreme Court has recently commented on the mandatory nature of the employer's subrogation right. In *Winfree v. Philadelphia Electric Co. & Allis–Chalmers Corp.*, 520 Pa. 392, 554 A.2d 485, 487 (1989), the court noted that the purpose of the act is to provide the employee with an exclusive right to benefits from his employer without proving fault. In exchange for this right, the act provides the employer who has paid such benefits a subrogation right. As the *Winfree* court stated, "The legislature could not have manifested more clearly its intent that the subrogation rights [sic] of the employer is absolute.... as a general principle of law, the employer's subrogation rights are statutorily absolute and can be abrogated only by choice." *Id.*

The Supreme Court's most comprehensive statement in recent years concerning the proper application of Section 319 is found in *Rollins Outdoor Advertising v. Workmen's Compensation Appeal Board*, 506 Pa. 592, 487 A.2d 794 (1985). In *Rollins,* the employee had received $27,000 in compensation benefits. He sued a third party and received $67,000 in settlement proceeds. The settlement was not structured—the entire amount was paid in a lump sum. The employee then agreed with his employer's compensation carrier that it would accept $10,000 in full payment of its subrogation claim, in exchange for which the employee would forego all future rights to compensation. The Supreme Court held that this was an illegal agreement and proceeded to determine the respective rights of the parties to the proceeds of the settlement with the third party.

The *Rollins* court made two calculations. First, it calculated the carrier's credit for future compensation under the third sentence of Section 319 which provides that where the recovery of the employee against the third party exceeds the compensation already paid by the employer, the balance of the recovery that the employee receives is a credit to the employer against future compensation payable. Then, the court calculated the carrier's liability to reimburse the employee for counsel fees and expenses incurred in prosecut-

ing the third party action. This calculation was done in accordance with the second sentence of Section 319 which provides that a subrogated employer must give up out of its share of the recovery a proportionate amount of the attorney's fees and expenses that the employee incurred in prosecuting the third party action. The court's calculation of the future credit, or the "grace period" in which the carrier would be relieved of making future compensation payments to the extent that the third party recovery exceeded compensation already paid, begins with a deduction from the settlement proceeds of the employee's contingent fee payable to his attorney in the amount of $25,000. The court's equation deducts these fees *prior* to deducting the carrier's subrogation claim.

Wolfe/Angino argue that because the *Rollins* court made an initial deduction for fees, the *Rollins* opinion establishes that the attorney's right to payment is prior to the carrier's right to payment. We disagree. The *Rollins* opinion does not address the issue presented herein. Although the *Rollins* court's calculations do reflect a payment of attorney's fees from the settlement proceeds, and *then* reflect deduction of the subrogated amount, we do not regard this mathematical formula as having any relevance to the priority issue we decide today. In *Rollins*, the settlement proceeds paid at the time of settlement were more than sufficient to pay *both* the entire attorney's fees and the entire subrogation claim. The court's calculations were solely aimed at determining the future period in which, under the third sentence of Section 319, the carrier would be relieved of paying the employee benefits to the extent that the settlement proceeds exceeded the amount of compensation already paid. This method of calculating the grace period cannot be construed as a holding that in all cases the attorney's fee is to be paid first, no matter what prejudice may result to the subrogated party's claim.

We also note that the *Rollins* court's actual discussion of the employer's subrogation right supports the position that the subrogation right is primary to the right of any other

person to the fund, whether it be the employee himself or his attorney. After quoting Section 319, the court stated:

> Thus, the compensation paid by the employer to the date of the third party recovery constitutes a claim against the recovery, payable *immediately* upon recovery to the employer. Any recovery in excess of the compensation paid to the date of recovery constitutes an advance of future compensation payable.

*Id.*, 506 Pa. at 596, 487 A.2d at 796.

Further, the *Rollins* court commented that there was a substantial difference to the employer (or its carrier) between immediate reimbursement for compensation already paid and awaiting reimbursement by receiving a credit against future compensation payable. In *Rollins*, the employee had argued that it made no actual difference to the employer if it was not immediately reimbursed from the settlement proceeds for compensation already paid because the employer would ultimately be made whole by receiving a larger credit against future compensation payable. The Court responded that this assertion "ignores the value to an employer of receipt of the entire subrogation amount in a lump sum at the earliest possible time." *Id.*, 506 Pa. at 599, 487 A.2d at 797.

Thus, although we do not regard the *Rollins* opinion as having disposed of the issue presented here, we regard some of the Court's statements as actually supporting the right of the compensation carrier to immediate payment from the recovery against the third party, prior to the claims of any other party thereto.

We also regard the precise language of Section 319 regarding the allocation of responsibility between employer and employee for attorney's fees and expenses in the third party action as supportive of the view that the carrier's subrogation claim is prior to the employee's attorney's fee claim. Section 319 in its present form dictates that the employer who has already paid benefits *shall* be subrogated to the right of the employee against the third party tortfeasor. Section 319 also recognizes the inequity of impos-

ing the sole responsibility for payment of these fees on the employee since obtaining the recovery or settlement also benefits the subrogated employer. Accordingly, Section 319 states that the attorney's fees from the third party action shall be prorated so that the subrogated employer must pay that proportion of the fees that the amount of compensation paid or payable bears to the total recovery or settlement against the third party. This provision defines the employer's responsibility to give up a portion of its subrogation claim in order to contribute toward the employee's attorney's fee. The balance of the fees are the employee's responsibility.

Were we to hold that the attorney must be paid in full for his services before the subrogated employer can receive any payment on its subrogation claim where, as here, the initial payment under the settlement will be totally exhausted by the attorney's fees, we would be construing Section 319 in a manner contrary to its basic intent. We would effectively be forcing the employer not only to contribute the proportionate share of the fees that the statute requires the employer to pay, but also to forego the value of having its subrogation claim satisfied at the earliest possible time. By requiring the employer to await payment until future installments under the settlement are paid, we would be denying the employer the use of that money until further settlement payments are made, despite Section 319's directive that the employer receive this money as reimbursement for benefits already paid. The attorney, on the other hand, would have been paid in full and the employee's obligation for his share of the fees satisfied in full. We do not read Section 319 as forcing a subrogated employer to "structure" repayment of its subrogation claim, while allowing the employee and his attorney to avoid structuring payment of the attorney's fee. Such a result would clearly undermine the intent underlying Section 319, which provides an "absolute" subrogation right to the employer in an attempt to do full justice between the parties.

By resolving this matter as we do, both parties receive a portion of the upfront settlement payment. Angino receives the proportion of his fee that the statute requires PMA to pay. PMA receives the amount in escrow. The balance of Angino's fee must be collected from future settlement payments and Wolfe will receive the balance of the settlement as it is due. We regard this as the most equitable solution and the one most consonant with the absolute subrogation right that Section 319 grants.

Thus, we affirm the trial court's judgment directing payment of the escrowed funds, plus accrued interest, to PMA in satisfaction of its subrogation claim for compensation benefits paid.